at all. Argument not to exceed 15 minutes per side. Mr. Euler, you may proceed for the appellate. Good morning. My name is Mike Euler. I represent the appellate, Dr. William Helm, in this case. There are two orders from the United States District Court of Louisville that are issued here. The first one was issued by Judge Russell on April 20th. He made the important note that a teacher has a property interest in a school complying with its own policies. To create a property interest, the policy must do more than provide direction. Compliance The two defendants, the appellees here, are Dr. Eells and Dean Halperin. Dr. Eells advised the department chairs at the University of Louisville School of Medicine and made them aware of the School of Medicine's policies and procedures. Dean Halperin was the dean who administered the school in accordance with those policies. There are two policies at issue. One is the promotion, appointment, and tenure policy, which I'll abbreviate as the PAT policy. The other is the research misconduct policy at the University of Louisville. On March 26, 2009, after a 10-year career treating women with gynecologic oncology cancers such as cervical and ovarian cancers, Dr. Helm learned that he was eligible for promotion to professor. It was quite an honor for that promotion to be recommended for him, and it was an extensive process that Dr. Eells oversaw. Exhibit 13 of our complaint is a fairly innocuous looking one-page document. There's about 20 or 30 things that need to be done, and Dr. Eells' name appears at the bottom because he was responsible for administering it and making sure that the department chairs did not follow the policies and procedures of the university. Notably, promotions to professor, this is a full professor at the university granted without tenure, are to be reserved for those faculty members who show proficiency in all areas of work design, excellence in the area of his greatest assignment, in this case for Dr. Helm, which is clinical and surgical skills, evidence of scholarship for tenure promotion, and more importantly, evidence of a national reputation for promotion to professor. All of that suggests that Dr. Helm's promotion was imminent. Now, it's true that whether or not to actually grant the promotion was discretionary, but the procedures set forth in the promotion to tenure policy were not. And if I may, I would like just to direct the board's attention, first of all, let me just go back. On September 25, 2009, after Helm had been recommended for promotion, and there was a vote taken by the promotion to tenure policy, or promotion to tenure committee at the University of Louisville School of Medicine, there was a memo that was circulated by Dr. Helm's division director, Dr. Lynn Parker, to Dr. Ells, claiming that Helm was a plagiarist. That's the most serious charge that you can make against an academic like Dr. Helm. Dr. Ells did not tell Dr. Helm of this charge, and more importantly, Dr. Cook, the department chair, reconvened the promotion to tenure policy while Helm was in Europe. And the promotion to tenure committee met without any notice to Helm and rescinded his promotion. The reason that's important is there's a promotion to tenure policy that's attached as Exhibit 31 to our complaint, and there are very specific mandatory ministerial obligations set forth in there. One of them is the department chair, Cook, shall notify the candidate of the nature of the chairs to be assembled and furnished to the committee. What page is that? It's page ID 155. Exhibit 31 to our complaint, and there at the very top, Item B, the department chair shall be responsible for notifying the candidate of the nature of the materials to be assembled and furnished to the committee. Now this committee met without any notice to Helm. And by the way, if you continue on, the notification shall include the statement that candidates for promotion may add information or documents and may examine the substantive materials. That was not done. Now Dr. Ells was overseeing this promotion. My question is, what did Dr. Ells do? Was he on that committee? We believe that he attended the meetings. Well, but was he the one responsible for running that committee? No, that would be Dr. Marvin Yostman. How could he be liable if that committee failed to abide by the policies? Because he advised that committee, he... This was a 1983 claim, right? That's correct. Does he have liability for supervision, or does he have to have a directly infringed constitutional right? Well, in Dr. Ells' case, he testified that he advised department chairs to make sure that they complied with the policies and procedures. So actually, by inference, he's the expert on the policies. Yeah, but I guess what I'm going at is, under 1983, under Mondale and other cases, is there supervisory liability for constitutional violations by subordinates? Well, I think in Dr. Ells' case, he was the one. I think that he was the supervisor. He was the person who had Dr. Helms file that promotion binder that I told you about. It's several hundred pages long. He was the one that... And I guess the missing link here is... Was he the one that was supposed to give notice to your client of the submission of these materials to the promotion? It appears that the PAT policy says that the department chair shall do it, but my question is, what did Dr. Ells advise the department chair? Who was the department chair? Dr. Christine Cook. And she was one of the complainants about the plagiarism right? She was one of two that acted as the judge, jury, and executioner. Okay, so you sued her, right, in state court? That's correct. Okay, but how does Ells have liability under 1983 for supervisory acts? Well, it's because we believe that the PAT policy specifically, and based on his own admission, that he is the one that guides and directs all these department chairs on how to comply with policies and procedures. He's the one. And I don't want to belabor this, but a police chief and a police officer goes out and clubs somebody unconstitutionally. Is the police chief typically liable for failing to supervise the police officer who violates unconstitutionally? I don't believe so. The difference here is, and this goes back to the fraudulent concealment and equitable tolling and equitable estoppel issue, there are lots of missing documents, including all of the items that I just started to reference on page 155, page 14 of 31 on the PAT policy. And those are, what did Dr. Ells tell the promotion and tenure, the PAT committee on October 14th? Those minutes are missing. Did you ever make a motion to compel for the production of those? No, we did not. What happened was we subpoenaed those records on June 3rd, 2013 in the state court case. Discovery closed on June 20th in summary judgment motions. Did you subpoena or did you file a motion to compel in the state court case? No, we did not because at the time, after we started getting the documents in July and August, Discovery was closed. We were briefing summary judgment. When we realized in March of 2014 that it may not have been, that all the documents were not provided. Did you take Cook's deposition in the state court case? We did. Couldn't you have asked her what documents were available to that promotion committee? Not only did we ask her, we sent document requests for document for these PAT meeting minutes. We didn't get them. So when we didn't get them, by the way, we deposed Dr. Marvin Gasol on May 20th, and he said, oh, these are the subpoenas. And the subpoena is document number 12-16, and we asked for all documents relating to Dr. Hound that were in possession of custody control pills, the PAT meeting minutes, and all documents relating to Hound that were in Dean Halperin's custody. I'm going to shift you just a little bit. Yes. Did the district court get summary judgment because of the statute of limitations? The district court granted summary judgment on the statute of limitations grounds on the research misconduct policy. Are you giving up on that? No, not at all. Okay. The thing I wanted to focus on was with regard to the research in investigative, which I believe is at page 73. Is there any language in that that says that the supervisor who becomes aware of a complaint has an obligation to notify the person who's been complained about? No. We think the research misconduct policy says that any institutional official who receives an allegation of research misconduct must report it to the research integrity ombudsperson and to that ombudsperson alone and nobody else. Okay, so both Cook and the other physician who made the pledger has an obligation. Yes. What obligation under this policy is there to ensure that Cook or the other person made the report to the research integrity ombudsperson? That's in the policy itself. I believe it's on page 11 of the research misconduct policy. All institutional officials shall report allegations of research misconduct versus research integrity ombudsperson. So both Ells and Halperin arguably had the duty to themselves report. Once Cook, Dr. Cook and Dr. Parker told Ells in this memo that Ells was a plagiarist, Ells had a duty at that time to report it to the research integrity ombudsperson. What if? That's not impacted by the fact that Taylor had filed a complaint. And that's what's so perverse about this, Your Honor. We have Dr. Cook and Dr. Parker acting as the judge, jury and executioner on a plagiarism claim against Helm that Helm didn't know about. And Dr. Doug Taylor, his division colleague, actually did file a plagiarism allegation against Dr. Helm with the Office of Research Integrity. And oh, by the way, it took the university 17 months to even notify Dr. Helm of it. And they notified him after he had been terminated. Well, let me go to the actual language was institutional members will report observed, suspected or apparent research misconduct. That's correct. So both Ells and Dean, they didn't observe misconduct, right? No, but they received writing from Dr. Cook and Dr. Parker that said Helm is a plagiarist. And they didn't have apparent knowledge of that, right? I think that that memo that Dr. Cook and Dr. Parker sent to Dr. Ells that we believe was forwarded to Dean Halpern, but we don't know because they haven't provided any discovery on that issue. When Dr. Ells received that memo, he should have said, and by the way, and I think he tried. When he got the memo, he told Dr. Parker, who was the author of the first memo, be careful about this research. He wrote a memo summarizing his advice. Remove guesses, I think is how he titled it, about Dr. Helm's motivation, e.g. research. Dr. Ells knew, Dr. Parker, you're not responsible for these allegations. We have a separate entity that's doing that. They ignored him. And the reason that they ignored him is because Dr. Cook was married to Dr. Larry Cook, who ran the medical school. The dean reported to him. And we think that that may have affected and colored Dean Halpern's judgment. Because, after all, Dean Halpern reported to Dr. Larry Cook, who was married to the department chair who reported to Dean Halpern. Let me go back to the statute of limitations. There's this e-mail exchange between Ells Cook and your client, where apparently, I believe it was Cook that asked, I spoke with Dr. Ells, we need to defer our discussion for 10 days, right? Yes. When was that? Your client received that, right? No. I'm not talking about, yes, he received that e-mail. When did he receive that? I think he received that on September 29th, which was the first time. September 29th. 2009. And when did he file the lawsuit? Against Dr. Cook and Dr. Parker? No, against Ells. On September 30th, 2014. But that's September 29th. So, by the time he got this e-mail, didn't he acknowledge that both Ells and the dean had been given notice of the purported misconduct? No, because the memo wasn't shared with Dr. Helm. He had no idea what they were talking about. When Dr. Cook brought her into his office on September 29th and talked about these research issues, Dr. Helm asked her, Dr. Cook, what are you talking about? She didn't share the memo with him, and more importantly, neither did Ells. And that was September 29th, when? 2009. And so he doesn't file the lawsuit, though, until 2013. That's correct. But, again, remember, on September 29th, 2009, Dr. Helm didn't have the memo. They didn't share it with him. Well, whether he had it or not, didn't he know that Ells had reported misconduct? No. He didn't. He was assuming that Ells was his activist. Ells had this information the day before, but he didn't share it with him. He never showed it. Ells had received the information. From Cook. Right. And he knew that the reporting requirement required all faculty members to report any suspected misconduct. So shouldn't he have known at that time that Ells had not reported it? Or within a year after that, would he have known that Ells had not reported it? No, Your Honor, because Dr. Helm didn't know what the allegations were. Dr. Helm had no idea that anybody was making any allegation of research misconduct against him at all in September 2009. The Taylor allegation was withheld from him. The Cook and Parker memo to Ells on September 25th and then again on September 30th was not shown to him. He did not know what was going on. That's what's so egregious about this conduct by the University and Dr. Ells. You're out of time. I don't know if you reserved your model time. Yeah, three minutes. Three minutes? Okay. You can use it now or you can use it later. I'll wait. Okay. Thank you. Good morning, Your Honor. Craig Dilger on behalf of Dr. Ells and Dr. Halpern. And I actually want to start with where Judge Blanchard left off. From our perspective, there are a multitude of reasons and basis on which to affirm the district court's decision in this case. Most importantly, again, is the fact that there are no property interests and there are no liberty interests. The district court went through a fairly significant analysis of that before getting to the statute of limitations issue on the research misconduct policy to talk about whether or not Dr. Helm had a property interest in his position, a property interest in his promotion, a liberty interest in his reputation, and ultimately a property interest. Let me focus on the liberty interest. Yes, sir. At this level of academic position, isn't reputation everything? Absolutely. In an academic setting, reputation is incredibly important. So we got that job in St. Louis. Yes, sir. Does that show for certain that he wasn't significantly impaired in obtaining other employment? Your Honor, I would answer that this way. I think it's critical to note that Dr. Helm is a contract employee. He was not a tenured professor. That goes to your contract claim. I'm talking about the reputational claim and the liberty interest claim. You're right. It does go to the contract claim. The contract claim, I think you've got a pretty good argument that each year the contracts specifically said this does not give tenure. Yes, sir. Don't expect you're going to get another contract in the future. But on the liberty interest, at this level of reputation, even if you get a job in St. Louis, does that mean there's no material issue as to whether the dependency of this damaged his reputation? Well, Your Honor, I think you have to look to those elements from the MedCorp case and sort of analyze those on a one-by-one basis to talk about the reputation. I think probably the point in your question is, was that information ever made public? Did it ever become known in such a way that it would affect his ability? When he applied, didn't he have to report this? I guess he only applied to St. Louis. No. That's actually in the United States. You're correct, Your Honor. But he's currently employed with a cancer institute in England, which by Dr. Helms' own testimony in a different case, is the preeminent cancer institution within the country. Before this lawsuit, who had he applied to besides St. Louis? Before – Your Honor, I believe that – I don't know the timing exactly, but I believe he had been at St. Louis for a period of time. He resigned that position. When I'm going to the liberty interest, did he have to tell other prospective employers about the tendency of this or the past disciplinary action for plagiarism? Your Honor, I believe it would depend on the institution, and I don't recall – He clearly told St. Louis. I'm sorry, Your Honor. He clearly told St. Louis. He did. He did. There's no question about that. Yes, ma'am. There's no question about that. To answer your question, though, I believe that it's an institution-by-institution basis. I guess what I'm asking is do we have any record evidence of him applying to places other than St. Louis where he had to disclose the tendency of this investigation? Not in this case, Your Honor. There is no evidence in this case of his application to other institutions. I believe that he did apply to other institutions. I would say to you that the University of St. Louis is a – a couple of quick points. The University of St. Louis, one, is a good research institution, so it has a good reputation similar to the University of Louisville's. It's also geographically in a similar area, so there wasn't the need to move in a significant distance from where he originally was. He got that position fairly quickly. He was employed in less than a year with the University of St. Louis. The other two important points are that position actually paid more at the end of the day, and he had – his position title, if you will, was better than what his position title had been at the University of Louisville. So if you look just at those factors when you're considering his liberty interest and his reputation, again, I would say that four of the five under the MedCorp case, he fails to meet. And under the standard, if you miss one of them, then you miss the – you miss the opportunity to pursue your liberty interest there. Just curious, is the Louisville AAA baseball team affiliated with it? They're both Cardinals, right? They are, Inspector. They are. The University – they're not affiliated. The AAA baseball team now are the Bats as opposed to the Cardinals, but you're right at a point in the past they were the Cardinals. Your Honor, I would just – let me conclude in answering your question that in terms of the liberty interest, it's clear that we agree that one of the elements was not met. It was, I guess, satisfied from Dr. Hellen's perspective in the sense that it was factually incorrect. The allegation was not found to be accurate. On all four of the others, I would say that they failed to meet any burden and carry that. Let me ask, because he was ultimately exonerated, would that be – does that satisfy the reputational – because he apparently failed to ask for a hearing to clear his reputation. And I think you argue that that independently defeats the liberty interest claim. Yes, sir. It is our position that that in and of itself defeats the liberty interest claim. But does the hearing satisfy – does the hearing ultimately exonerate him? Is that the equivalent of a request to – for a reputational hearing? It is, and I want to be clear, Your Honor, there was not actually a hearing, as I would consider it, a hearing in front of a tribunal or a panel. What happens is that process moves along within the university, and there is a group of folks who review – I guess you could call it a hearing, but it's really more of a review of the cases that comes before them. And they did that, and he was ultimately exonerated, and they found that there was no – I would – and it's important to make this clear from our perspective. It would be our position that there was no actual allegation of plagiarism that rose to the level of Dr. Howard. The evidence would be that the allegation was that he had taken ideas from collaborators or other academics that he had worked with. Probably not important to your question. Your Honor, that's a great question, and here's why that's important. He was not actually suspended and put on leave as a result of plagiarism or the taking ideas, however you want to characterize it. He was – the – I believe the evidence would show, although we obviously didn't get to that point in this case, that he was suspended and placed on leave because of issues he had within the department. Those would be issues of his ability to cooperate or collaborate with other academics, his – you know, other professors within the department, his ability to work with his supervisors. Mr. Woyler referenced Dr. Cook and Dr. Parker. Both of them were involved in that process. So he actually – So is that – you're claiming that that was a completely parallel process and he was already being punished? It was. Or in being disciplined, shall we say? Yes, ma'am. In that, and it had nothing to do with his other allegations? It did not. And in fact, two separate sets of folks were involved in that. As Mr. Woyler referenced, Dr. Taylor, Doug Taylor, was the person who initiated the plagiarism or the taking of the – whatever you want to call that. It was actually Dr. Cook and Dr. Parker as his superiors within the department that initiated the process of suspension and mandated leave and kind of pushed that process through, ultimately up the chain to Dr. Ells and Dr. Halperin. So it's an important question because it's actually two separate issues happening at the same time. So you're saying Cook and Parker did the administrative leave suspension part? Yes, ma'am. But they're the ones who reported the plagiarism to Ells? They were – the actual complaint was by Dr. Taylor. We have to be honest, but the problem here is that they reported the plagiarism to Ells. Well, again – So it's the same – I'm just trying to – it's the same people. It is the same people in the sense that part of that discussion with Dr. Ells was from Dr. Cook and Dr. Parker. There's no question about that. I would come back to, because I think it's an important point, that what I believe the evidence would show, or at least in this case, is that it was not plagiarism. It was that Dr. Helm had taken ideas from some of his collaborators. That's critical from the university policy perspective because under the university's policy, if you're accused of taking ideas or of utilizing something that you had worked on with a collaborator, that does not fall under the research misconduct policy. In fact, it's a specific exception to the policy that if it's an issue between collaborators – And the one that becomes obvious to those of us who don't work with any university would be who signs a particular document or grant application or the ultimate result, the paper that results from research. A lot of times the issue becomes who's the signature – who's the primary signature and who are the subsequent signatures, and that's why that issue becomes critical. Can I shift you completely? This wasn't argued, so it may have been waived, but did the district court ever tell you or give a specific notice that it was converting motions to dismiss to a motion for summary judgment so that both parties would know that they better file whatever evidentiary materials they needed to support or oppose a summary judgment? No, sir. The opinion issued by the judge in the district court was the first analysis, I guess you would say, where there was indication that it was not a motion to dismiss, but it was considered as a motion for summary judgment. Because the standard obviously would be different for a 1286 and a 56. It would. I agree with you. I think that the standard – The two attached a huge amount of evidentiary materials. They attached and responded with a huge amount. I'm sorry, Jason. We didn't attach – Mr. Oyler attached a large amount of evidentiary material. I don't think that we attached a large amount because from our position it's a legal argument. We felt all along that it was a motion to dismiss and was properly granted. Obviously, the judge transitioned it somewhat to a motion for summary judgment. I still think the standards are appropriately met in the sense that there are no property or liberty interests. In the decision, though, didn't he reference a lot of the materials that had not been included in the complaint? He did. He referenced a number of the items that Mr. Oyler included in it. Would it have given you, perhaps, and also them more notice that it was going to be treated as a Rule 56 motion? Your Honor, I don't believe so, and here's why. I think that he ultimately made the – and I realize that the opinion transitions it to a Rule 56 motion, so I'm not saying that it doesn't. But he ultimately made the decision on the legal issues in front of him. He referenced the liberty and the property interests, the statute of limitations that you asked about earlier. So from our perspective, even though that language is in the opinion, the ultimate decision was really made based on the legal arguments. And I think, again, from our position that there is no property interest, there is no liberty interest, and we would say there is no property interest in the application of the research misconduct policy. Before the judgment, did you submit any evidentiary materials? Yes, sir. In this particular case – and again, Mr. Oyler referenced a number of facts and information that relate to other cases where Dr. Elm is a litigant against some portion of the University of Louisville. But for this case with Dr. Elm and Dr. Halperin, it was my feeling and my position that the legal arguments were very clear and neither of them had any liability here for – again, for the liberty and property interest issues. And then to go to your final point, the statute of limitations clearly was applicable with regard to the application of the research misconduct policy. I would make one point on that issue because there is, I think, an important distinction. Your Honor asked Mr. Oyler a number of questions about the dates on which Dr. Elm may have known about the application of the research misconduct policy and when the year would have started to run. But I think it's critical to note that even if you agreed with all of the argument there, there was a deposition taken of Dr. Elm May 28, 2013. Mr. Oyler actually was the person taking the deposition. So at the very latest, that date would have been – I read through that. Is that as important as the – because that kept asking the question as to whether he had encouraged Cook and the other physician to report it. But I don't recall it specifically asking, did you report it yourself? Do you have an obligation to independent – else, do you have an obligation to independently report it and did you fail to do that? Your Honor, it would be my position that in that deposition, he asked the questions relative to the research misconduct policy and was it applicable. Had it been – what was the next step? Had the next step been taken? All those things that certainly would have led Dr. Elm to believe that the research misconduct policy was not being applied in this situation, which then would have kicked the statute of limitations. Your Honor, I realize my time is up. From our perspective, again, we believe whether it's a motion to dismiss or a motion for summary judgment that the district court has laid out a significant number of grounds on which to – for you to affirm their decision in this case and we would ask that that happen. Thank you. Mr. Oyler, you have three minutes to respond. Very briefly. First of all, as it relates to the suspension or the leave, Dr. Elm filed a grievance with the University of Louisville. The suspension or leave that Mr. Dilger talked about, the Faculty Grievance Committee said that there was no compliance whatsoever with the red book by placing Dr. Elm on the suspension or leave. Completely done against the university rules and Dr. Elm, again, was the person that was advising Dr. Cook and Dr. Parker. As to the liberty interest, if you recall, Reagan Donovan, President Reagan's Labor – Secretary of Labor, shortly after he was – after the President nominated him, there was this criminal allegation that was made against him. He spent three years – three years in the United States District Court, I think in Philadelphia, and when it was over, he was exonerated. He asked a question that's applicable here today. To which department of the University of Louisville does Dr. Elm go to get his reputation back? Where does he go? It's rude. He's been labeled a plagiarist. His dean, his department chair, and his division director have told who knows how many people that he's a plagiarist. I'd like to conclude by spending just a moment on the equity – Did he request a name for him? Well, we did – we did in early 2015, and the university declined that and just said, we'll just send – we'll send some letters out to some people that might want him. Didn't he have an obligation to request that before he brings his lawsuit? No, there's no – the breach of his misconduct policy has no time limits in there. It just simply says that the respondent may request – What about under the Quinn case? Doesn't Quinn tell us that you have to request him? I think – well, and in this – I think we addressed that by also saying such a request for a formal name-clearing hearing in front of the people that heard about it would have been futile because the university's trampled – Well, he ultimately won it. How can you say that? I'm sorry? How can you say that? He ultimately won it, and they found that their head didn't respond to that. Right. Well, that's correct. What we were asking for earlier this year was a name-clearing hearing, I think, as some of the Sixth Circuit cases talk about. So, I think there's a fundamental difference there. They simply sent out a couple of letters to people saying, oh, by the way, no one was exonerated. We don't think that – in light of what's happened to him, we think that doesn't do any back-to-justice. We suggested having something on the UofL website talking about what they did to him, and all of these allegations were completely false. If I may just conclude – I've got 40 seconds left – equitable tolling. We issued a subpoena, as we told the court about, back in 2013. There have been lots of things that have been withheld. We've got state court action against the University of Louisville, and three weeks ago, the university produced an email to Dr. Ells showing that he had the PAT meeting minutes. They produced it. He has withheld that. Those PAT meeting minutes tell everything, but the university now says, we don't have those minutes. The paper copy, they say, is gone, the electronic copy from the secretary is gone, and all the people that received it, they say, is gone. Someone has destroyed documents, and it's not these lawyers. I can tell you that. Someone at the university has done that. Is that an issue in the case? Absolutely. It's the equitable tolling issue. Oh, it's the equitable tolling issue. Precisely, and it's because I think the Sixth Circuit says that equitable tolling permits a plaintiff to avoid the bar of statute of limitations if, despite all due diligence, he is unable to obtain vital information bearing on the existence of his claim. Those PAT meeting minutes are going to tell us everything about the PAT policy and violations of the research misconduct policy, because somebody said at that PAT meeting, and it might have been Ells, you can't go forward with Hellen's promotion because he is a plagiarist. Okay. Any further questions? Thank you. Thank you, counsel. The case will be submitted. Thank you, Your Honor.